ROBINSON *vs.* THE INTERNATIONAL LIFE ASSURANCE SOCIETY OF LONDON.

Where a foreign corporation, lawfully engaged in the business of life insurance in this state, created and maintained an agency in the city of New York, for that purpose, and organized a local board of directors there, with authority to issue policies, and adjust losses, without consultation with the corporation itself; *Held* that the local board and the agency, combined, did not form or constitute a corporation, but simply the local means or agency through which the corporation transacted its business in this country; that no matter how formal or complicated such local organization might be, it could only possess and exercise the power conferred by the foreign charter, and the laws of the state, upon the corporation itself; and that when the local board and agency issued a policy, collected a premium, adjusted a loss, or appointed a subordinate agent, the act was not done for such board itself, but for the corporation.

*Held, also,* that such agency at New York appearing to have been of the most complete and general character, it had the power to appoint subordinate agencies, wherever, in its judgment, the business of the corporation required them to be located. That this could be done either in writing or by parol; and that when the appointment was made by writing, and nothing limiting

Robinson *v.* International *Life* Assurance Society of London.

the action of the New York agency was contained in it, the power of the local agent could afterwards be enlarged by parol.

And such agency at New York having appointed an agent for the corporation, at Richmond, Virginia, by a writing not conferring upon him authority to receive payment of premiums; that authority being derived from renewal receipts forwarded to him from the agency at New York from time to time; *Held* that there was nothing to prevent the New York agency from afterwards authorizing the agent to receive the premiums accruing on policies, without being supplied with renewal receipts for that purpose.

And it being claimed that the condition of the country, during the rebellion, having rendered the transmission of renewal receipts impracticable, after 1861, it was to be presumed that authority was actually conferred upon the agent to act, without any such receipts; and the jury having found, upon conflicting evidence, that the authority was conferred, substantially as claimed; *Held* that the court had no power to interfere with their conclusion.

And that if the authority was conferred, it amounted to a general authority to the local agent at Richmond to collect the premiums accruing to the company upon the policies it had previously issued, and to receive the same, without renewal receipts, and without specific directions as to what he should receive them in.

That the agent was bound to exercise this authority according to the ordinary course of the business he was employed in, and the settled usages, if any were found to exist, relating to the subject, and that, although he could not bind his principals, or satisfy the powers of his agency, by accepting *property* for the premiums, yet that from the nature of the power to receive payment, the agent necessarily derived the power to accept *whatever was generally used* for the purpose of making payments in the locality where the debts were to be collected.

And, the actual currency of that locality being, soon after the agent was directed to collect the premiums without renewal receipts, supplanted by *Confederate notes*, which were thenceforth the financial means used, there, for buying and selling property, and for creating and discharging debts; *Held* that the agent was authorized in his discretion, to receive such notes in payment of premiums; and that having so received them, in good faith, the payment was valid and binding, as between the assured and the insurers. MULLIN, J. dissented.

*Held, also,* that this being the only possible mode, under the circumstances existing at the time, in which the premiums could be collected by the agent, and it having been made his duty to obtain their payment, he was necessarily authorized to receive it in that manner.

That even if that authority was not necessarily incident to the power conferred upon him, still, as he was authorized to collect the premiums, his acceptance of Confederate notes, for the amount of them, discharged the assured; as it could not have been expected nor intended that the identical currency

received by him should be remitted to the general agency at New York while commercial intercourse between the two places was interrupted, by the war. A contract of insurance, made between an English corporation and a citizen of Richmond, Virginia, previous to the war, being a contract between a neutral and a rebel recognized by the insurer's government as a belligerent, was not annulled or suspended by the war; and the insured is not prevented by any thing rendering the insurance illegal, from maintaining an action upon the policy.

THIS action was brought upon a policy of life insurance issued by the defendant by its local board of directors in the city of New York to Cunningham P. Macmurdo on the 8th day of December, 1845. The policy is substantially in the usual form of such instruments, and by it, in consideration of the payment of the premium agreed upon, the defendant agreed and undertook to insure Macmurdo's life in the sum of ten thousand dollars. The premium upon the insurance was regularly paid by the assured, who was a resident of Richmond in the state of Virginia, to and including the month of June, 1861. After that, and down to the time of the decease of the insured, which happened in October, 1862, the amounts becoming due for premiums under the policy were paid by the assured, but such payments were made in what is known as Confederate currency. All these payments were made after the spring of 1858, to W. S. Cowardin, who was the defendant's agent at Richmond. He was appointed as such agent by the defendants' general agents at the city of New York. And he received what were called renewal receipts, which were delivered to the insured from time to time for the premiums paid upon his policy down to about the month of June, 1861. These renewal receipts were issued to the local agent by the general agents at the city of New York, and constituted his authority to receive the premiums. After June, 1861, none of these receipts were issued to the local agent. But from that time it was claimed by the plaintiff that the premiums were received by the local agent under a special authority verbally con-

ferred, by which renewal receipts were from that time dispensed with.

After the decease of the insured the proofs required by the policy were furnished to the defendant, and the claim for payment was assigned to the plaintiff.

Upon the trial, a verdict was recovered by the plaintiff, and from the judgment entered upon it the defendant appealed.

*Jas. W. Gerard, Jr.* for the appellant. I. The subagency at Richmond was created by the New York board, and the London corporation knew nothing of it, and had no privity with the agent.

II. The company had a double *situs*, in London and in New York, and the American branch was a separate and independent corporation, as to business in the United States. (*The Jonge Klassino*, 5 *C. Rob.* 302. *The Ann*, 1 *Dodson*, 221. *The Antonio Johanna*, 1 *Wheat.* 159. *Elbers* v. *United Ins. Co.*, 16 *John.* 128. *Phil. on Ins.* 112, § 164. *Society* v. *Wheeler*, 2 *Gall.* 105, 131. *People* v. *Central R. R. Co.*, 33 *How. Pr.* 407. 1 *Duer on Ins.* 525.) The domicil of a party is the test of his national character. (5 *Lawrence's Wheat.* 559–569. *McConnell* v. *Hector*, 2 *Bos. & Pul.* 549. 1 *Duer on Ins.* 495. 1 *Kent*, 85–88, 10*th ed.* *The Indian Chief*, 3 *C. Rob.* 12. *The Venus*, 8 *Cranch*, 253. *Beebe* v. *Johnson*, 19 *Wend.* 500. *The Venice*, 2 *Wal.* 275. *The Frances*, 8 *Cranch*, 363. *The Freundschaft*, 4 *Wheat.* 105.) This doctrine prevails in the case of agency. (*The Anna Catharina*, 4 *C. Rob.* 107. 1 *Kent.* 87. *The San Jose,* 2 *Gal.* 268.)

III. The state of war which existed made all parties resident in the two sections, *enemies*, in contemplation of law. (*Mrs. Alexander's Cotton*, 2 *Wal.* 404. *The Hiawatha cases*, 2 *Black.* 635. *Griswold* v. *Waddington*, 16 *John.* 438. *Blatch. Prize cases*, 556. *Act of July* 13, 1861. 12 *U. S. Stat.* 257. *Proclamation, Aug.* 16, 1861.) The domicil of

the defendant being in New York, its national character, for the time, was that of an American company; and all intercourse and business transactions between it and the plaintiff, or the sub-agent at Richmond, were illegal and void.

IV. The state of war revoked the agency. (*Carver* v. *Lane,* 4 *E. D. Smith,* 168. *Lawrence's Wheat.* 557. *The Julia,* 8 *Cranch,* 181. *The Rapid, Id.* 161.. *Griswold* v. *Waddington,* 15 *John.* 57. 16 *id.* 438. 1 *Kent,* 10*th ed.* 77. *The William Bagalay,* 5 *Wal.* 407. *Honger* v. *Abbott,* 6 *id.* 534. *Jecker* v. *Montgomery,* 18 *How.* 110. *Esposito* v. *Bowden,* 7 *E. & B.* 788.) A *fortiori* is the insurance of an enemy's goods, and particularly of his life, against public policy, and suspended during the war, if not avoided by the war. (1 *Duer on Ins.* 417. 3 *Kent,* 255. 1 *Phil. on Ins.* 3*d ed. p.* 104, § 149. *Furtado* v. *Rodgers,* 3 *Bos. & P.* 191. *Kellner* v. *LeMesurier,* 4 *East,* 396. *Gamba* v. *Le Mesurier, Id.* 407. *Brandon* v. *Curling, Id.* 410.)

V. Even if the defendant be regarded as a neutral sojourning here, it is against public policy to uphold this contract. (1 *Duer on Ins.* 623. *People* v. *Central R. R.* 33 *How. Pr.* 407. *Kennett* v. *Chambers,* 14 *How.* 39.)

VI. There was no evidence of express authority to take Confederate notes, and such authority cannot be implied. They were not money, and an agent's authority to receive payment means in *money,* strictly. (*Matthews* v. *Hamilton,* 23 *Ill. R.* 470. *Todd* v. *Reid,* 4 *B. & Ald.* 210. *Russell* v. *Bangley, Id.* 395. *Dunlap's Paley on Agency,* 280, 281. *Partridge* v. *Bank,* 58 *Eng. Com. Law,* 396. *Grant* v. *Norway,* 73 *id.* 457. 11 *C. B.* 457. *Ontario Bank* v. *Lightbody,* 13 *Wend.* 101. *Taylor* v. *Robinson,* 14 *Cal. R.* 396. *Story on Agency,* § 98. 10 *Barn. & Cress.* 760. *Barker* v. *Greenwood,* 2 *Y. & Col.* 415. 5 *Mees. & Wels.* 645. *Howard* v. *Chapman,* 4 *Car. & P.* 508. 1 *Starkie,* 233. *Underwood* v. *Nichols,* 17 *C. B.* 239. *Stewart* v. *Aberdein,* 4 *Mees. & Wels.* 211, 228.)

VII. Dealing in these notes was illegal; and no authority can be implied to do an illegal act. (*Clark* v. *Bank*, 3 *Duer*, 241. *Wright* v. *Overall*, 2 *Caldwell*, 355. *Craig* v. *Missouri*, 4 *Peters*, 410. *Briscoe* v. *Bank of Kentucky*, 11 *id.* 258.)

*E. R. Robinson*, for the respondent. I. Cowardin was, until after the death of Macmurdo, the authorized agent of the defendant to receive payment of the premiums falling due on his policy. 1. The existence of war or rebellion in the state of Virginia did not revoke or in any way impair the authority of Cowardin to act as the agent of the defendant in the receipt of premiums upon existing policies. (*a.*) Even if the defendant had been a New York corporation, the war or rebellion would have no such effect, so far as existing contracts were concerned. A power of attorney is not rovoked by war. An agent whose principal resides in the enemy's country may continue to act as agent, and his acts be valid; *e. g.* he may sell a piece of property under a power given before the war, and the sale will be valid. (*Griswold* v. *Waddington*, 15 *John.* 69.) He may collect debts under a power given before the war, and payment to him will bind the principal. (*Clarke* v. *Morey*, 10 *John.* 69. *Bell* v. *Chapman, Id.* 183.) Even as between the citizens of two hostile countries, war does not dissolve or suspend all contracts, but only such as in their execution involve the crime of treason—giving aid and comfort to the enemy—the transfer of property, commercial intercourse and communication. And thus it is held that an alien, resident in the United States, during a war between his country and the United States may sue and be sued. If he may sue, *a fortiori* he may receive payment without suit, or may authorize an agent resident in the debtor's country to do so. (*Clarke* v. *Morey*, 10 *John.* 69.) And in *Buchanan* v. *Curry*, (19 *John.* 136,) it was held "not unlawful for a citizen of this state to pay a

debt or perform a contract with an alien enemy during war, if the payment or performance be made to the agent of such alien enemy within the state, the contract having been made before the war." "As when A, an American citizen, entered into a contract, in February, 1812, with B, a British subject, for the delivery of timber, part of which was delivered after the declaration of war, to the agent of B, at the stipulated place within the United States." Held not illegal. (*See also Clarke* v. *Morey*, 10 *John.* 73 ; *Conn* v. *Penn*, 1 *Wash. C. C. Rep.* 524; *Dennistoun* v. *Imbree*, 3 *id.* 396.) The act of congress of July 13, 1861, (*Stat. at Large, vol.* 12, *p.* 251, § 5,) and the proclamation of the President, of August 16, 1861, in pursuance of it, was merely an application of the existing rule with respect to the inhabitants of belligerent states to the contest then going on. It did not introduce a more severe rule, nor did it apply to commercial intercourse between neutrals and the inhabitants of the other belligerent. It was held by Attorney General Bates, in an opinion delivered December 4, 1861, that under this act of congress, and this proclamation, there was no objection to the execution of contracts which, while they involved the transmission of property to the loyal states, did not involve the transmission of property to the states in rebellion. (*See opinions of the Attorney General.*) (*b.*) The company is, however, an English company, and in no sense whatever a New York company. It is incorporated by and under the laws of Great Britain, not under the laws of New York. The only right which it has to transact business here is as a foreign corporation, under the laws of 1853. It made its deposit of $100,000 with the insurance department as a foreign company, and makes its annual return to the insurance department as a foreign company, and has an officer upon whom process may be served as a foreign company. It cannot by its own act give itself a charter of incorporation from this state, and the manner in which

it chooses to transact its business here by general agents and a board of directors, cannot certainly affect its legal status here as a foreign corporation. Being therefore a corporation in a neutral country, in what possible way could the existence of the late war, considered as a war, affect it as principal, in its legal relations with its agent in one of the belligerent countries? Regarding the late war as a mere insurrection, why should a political disturbance of that kind strip the agent of an English corporation, in the district occupied by the insurgents, of his authority to act for his principal? It might with equal reason be contended that all the powers of attorney held in this city for foreign houses were revoked during the riots of 1863. Cowardin's authority was not therefore revoked or modified by the mere existence of the war. Besides, the defendants themselves recognize it as existing after the war. They admit, in their answers, the validity of the payment of the renewal premium by Macmurdo, June 8, 1861, when the war had been going on for several months. 2. The instructions of the court, therefore, with reference to this part of the case, were, if any thing, too favorable to the defendants. Their ninth and tenth requests to charge were properly refused, and their seventh and eighth requests charged as requested, were too favorable, in that the court ruled that the defendants, an English company, " were to be regarded in the same light as citizens of the United States, under all the provisions of law affecting the relations of citizens of the United States with their enemies." 3. The explicit instructions which the jury found had been given by the general agents to Cowardin through Willis settle the question of the continuance of Cowardin's authority after the war if there is any doubt about its continuance as a matter of law.

II. Even prior to the instructions to Cowardin, testified to by Willis and Cowardin, the apparent authority of

Cowardin to receive premiums of insurance upon policies was not restricted to cases of the delivery by him to the insured of receipts for such premiums, signed by one of the general agents of the defendants in New York. 1. His practice in this respect, even before the war, had not been uniform. 2. Whatever his private instructions may have been, they were not communicated to policy holders and could not affect them, and evidence of them should have been excluded. 3. The renewal is complete by the payment of the premium. The receipt is evidence not of the debt, but of its payment. It is a voucher entirely for the benefit of the policy holder, which he may dispense with if he chooses. The form of it is a mere matter of private instruction between the company and the agent, of which the policy holder knows nothing. How then can it be claimed that the absence of this particular form of receipt was an implied revocation of which policy holders were bound to take notice at their peril? It would be extraordinary indeed if the failure of the principal to send a voucher would destroy the effect of a payment to an authorized agent. 4. There was a receipt, signed by Cowardin alone, and not by the general agents, given to Macmurdo on the payment of June 8, 1861, which is admitted, in the answer, to have been a valid payment. On the 26th of June, 1861, Cowardin wrote to the general agents inclosing an account showing this and other payments, and stating that he was issuing temporary receipts on such payments. On the receipt of the letter and account no objection was taken to his action, and the payments were posted in the defendants' books as valid payments.

III. The court, therefore, would have been justified, even without reference to the explicit directions to Cowardin to take the premiums and give temporary receipts, in instructing the jury that there was no restriction upon Cowardin to affect policy holders, such as the defendants

claimed.   In leaving the question of such directions to the jury, and in instructing them according to the defendants' first and second requests, its course was one too favorable to the defendants, and one with respect to which they can have no ground of complaint or exception.

IV.  Cowardin having been the authorized agent of the defendants to receive renewal premiums and give his own receipts therefor until after the time of Macmurdo's death, Macmurdo's policy was not forfeited, because the premiums falling due after the 8th day of June, 1861, were paid to and received by Cowardin in Confederate currency. 1.  There was evidence that the general agent, Holbrooke, instructed Cowardin to go on and receive premiums, with full knowledge of the issuing of Confederate currency; and it also appeared that after the receipt of Cowardin's letter of February, 1863, telling all about the payments in Confederate currency, and all about the circumstances of Macmurdo's particular case, the company still allowed him to act as their agent, and took no exception to his conduct.   2.  The question as to the kind of money received by Cowardin, or the manner of payment to him, is entirely a question between him and his principal.   His habit was not to transmit the thing actually received for premiums to the company, but to credit them with the amount of the premiums, and pay the company by his own draft, so that in the case of the payments of premiums after the 8th of June, 1861, they have the liability of Cowardin precisely as they had in previous cases, and therefore, so far as the company are concerned, it is a matter of no consequence in what shape they were paid to Cowardin.   This was the regular way in which business was transacted between the company and the agent, and even when this is not the regular way, it has been held that "an agreement, in good faith, between the insured and an insurance agent, that the agent shall be personally responsible to the insurers, for the premium, and that the insured should

be the debtor, not of the insurers, but of their agent, is a payment of the premium." (*Parsons on Contracts, 5th ed. vol.* 2, *p.* 487, *and cases cited.*) What right, therefore, has the company to go behind the agent's admitted liability, and inquire into the nature of what he received? If he had chosen to receive any other depreciated currency, *e. g.* the bills of Virginia banks, there being no fraud on the part of the policy holder, can the company on that ground claim a forfeiture of the policy? No matter what the agent received, and even if he received nothing at all, can the company claim a forfeiture of the policy? 3. The position of the plaintiff, therefore, is even stronger than if he had paid the premiums in Confederate currency directly to the company itself and taken its receipts. Even if they could have questioned the legality of the transaction in that case, they cannot do it as the case stands, if the previous reasoning be correct. 4. But they could not in any case claim the forfeiture of the policy on the ground of the *illegality* of the payment. (*a.*) They are an English company—a company belonging to a state which, during the late war was carrying on a regular commercial intercourse with the states in rebellion—running steamers into their ports, recognizing their government as lawful, their currency as valid, their obligations as more valuable than those of the United States. Should such a company be allowed to forfeit a policy on which the premiums had been regularly paid during seventeen years, on the ground that the last few premiums were paid in a currency which they once sustained as far as they could, but now seek to repudiate as *illegal?* (*b.*) The company and its authorized agent had the power to waive the performance of this condition of the policy. This they could do by letter, by parol, or in any other way in which the intention to do so was clearly expressed; and they did so in the present case, by voluntarily accepting a payment in Confederate money as a valid payment. (*Buckbee* v. *Ins. Co.,* 18 *Barb.* 541.

*Ruse* v. *Ins. Co.*, 26 *id.* 556.) (*c.*) By accepting the payment in Confederate money as a good payment, the company prevented Macmurdo from offering to pay in gold and silver, or in any other manner, or from taking any other steps to keep his policy from being forfeited. They are, therefore, now *estopped* from disputing the validity of these payments. (*d.*) It will be noticed, also, that the company have never offered to restore what they received, or any portion of it, although it had an actual value at the time it was received. It has been expressly decided that in such case a payment in Confederate currency, even though it were originally received under compulsion of fear or duress, is binding. In *Emerson* v. *Lee,* decided in the Supreme Court of New Orleans, it was held that a payment in Confederate money, which was received under compulsion of fear or duress, did not extinguish the debt, provided the party receiving the currency retained and tendered back the identical currency to the party who used it—*otherwise, if he used it, so as to recognize the payment.* In such case he should not be allowed to recover the debt, as well as to have the benefit of the Confederate money paid. *A fortiori,* of course, in this case, when the payment was voluntarily received in the beginning, as well as subsequently recognized. (*e.*) Executory contracts of which the consideration was Confederate currency were upheld in *Green* v. *Sizer,* (40 *Miss. R.* 530, 552,) and in *Murrell* v. *Jones,* (*Id.* 565, 574,) on the ground ably sustained that when "the contract does not grow immediately out of the illegal act, but is unconnected with it and founded upon a new consideration, such contract is not invalid, but will be enforced by the courts, notwithstanding the issuance of treasury notes might be wholly unlawful." And so in *Phillips* v. *Hooker,* (*Phillips North Carolina Eq. Rep.* 193. *S. C.* 7 *Am. Law. Reg. N. S.* 40,) and in *Turley* v. *Nowell, Id.* 301,) bills in equity to enforce contracts of which the consideration was Confederate currency were

sustained. It was conceded in these cases, on all sides, that with respect to *executed* contracts of which the consideration was Confederate money, no question could be raised. And even those courts which have been most strenuous in denying the validity of *executory* contracts, have held that they would not disturb *executed* contracts, though predicated upon Confederate treasury notes. (*Henly* v. *Franklin*, 3 *Caldwell*, 472. *Brown* v. *Wylie*, 2 *West Virginia R.* 509. *Abbott* v. *Dermott*, 34 *Georgia R.* 227.)

The contract in question is an executed contract. The plaintiff, in this case, does not seek the performance of an executory contract, of which the consideration was Confederate money. He merely asks that a contract, of which the consideration was lawful money, should not be set aside and forfeited, on the ground that a condition subsequent of that contract, was not adequately performed by a payment in Confederate money, although the other contracting party chose to receive the payment as a good performance, and to waive any other performance of the condition subsequent. Our position is, that, however it may be with the enforcement of an executory contract, the consideration of which was Confederate notes, when such a contract has been executed, and the rights of the parties voluntarily settled, for the quiet and repose of society, courts will not disturb it. To illustrate our meaning: If a debt was contracted during the war, in Confederate money, and the creditor paid it in Confederate money, the creditor cannot recover it again. If a debt was contracted before the war, in gold and silver, and paid during the war in Confederate money, received not under protest or duress, the debt cannot again be recovered. If property was sold and paid for during the war in Confederate money, the vendor cannot now recover back his house, nor can he sue for the value of it. (*Phillips* v. *Hooker, Supreme Court, North Carolina, vol.* 7, *N. S.*

Robinson *v.* International Life Assurance Society of London.

*p.* 40.) If property was sold before the war, for which notes were given, and the last of those notes fell due during the war, and was paid in Confederate currency, the vendor cannot now recover on that note. If property was sold before the war, for which notes were given, with the condition annexed that if the vendee failed to pay any of the notes, the property should be forfeited, and the owner entitled to reclaim it, and the last one or two notes were paid in Confederate money, the owner could not enforce the forfeiture, nor could he recover on the notes. If a lease was made before the war, liable to be forfeited by a failure to pay the rent reserved, and the rent was paid in Confederate money, the landlord could not insist upon a forfeiture, or bring an action of ejectment to recover the land. If a policy of insurance was made before the war, by which the company agreed to pay a certain sum on the death of the insured, and he agreed to make quarterly payments during his life, and the last one or two of these payments were made in Confederate money, the company cannot forfeit the policy, nor can they recover the payments. This was the view taken of the law by the learned judge, who tried the case, in his refusal of the defendant's third, fifth and sixth requests to charge, and in his instructions to the jury. The opposite view, claimed by the defendant, would uproot the whole fabric of southern society, resting upon the daily contracts between man and man, during the four years of war, and would operate more harshly than any confiscation measure which could be devised. This court will hesitate long before adopting a principle fraught with such monstrous injustice, and which, carried out in the present case, would confiscate a policy of insurance—the provision for a family, to secure which premiums had been paid for a long series of years—for the benefit, not of a northern citizen, but of an English corporation.

*By the Court,* DANIELS, J.   It appeared, by the evidence given upon the trial of this cause, that the defendant, at the time of the issuing of the policy in suit, and at all times since then, was an insurance corporation, created by an act of the English parliament.   And as that was its legal character, although it had complied with the laws of this state providing for the manner in which foreign insurance companies may carry on and transact the business of insurance within this state, it nevertheless still remained and continued an English corporation.   The law of this state, however, conferred authority upon the defendant only to transact its business within the state of New York.   It could not, nor did not, authorize or empower it to appoint an agency, or carry on its insurance, within the state of Virginia.   Whatever it did, in that respect, was done by virtue of the laws or comity of that state.   And, for that reason, no particular reference will be required to the provisions of the statute, under which foreign insurance companies are permitted to carry on the business of insurance in the state of New York.

It is sufficient, for the purposes of this case, to assume that the defendant was lawfully engaged in that business in this state, and that it had legally and properly created and maintained its agency for that purpose.   And that the agency here, by a proper exercise of its authority, had appointed the agent at Richmond to transact the business of the defendant and its New York agency, required to be done at that place.   But even these assumptions, added to the circumstance that the defendant had organized a local board of directors at the city of New York, having authority to issue policies, and adjust losses, without consultation with the corporation itself, could not have the effect of changing the nature of the corporation, under which all this was performed.   The board was organized, and the agency was created, by the act and under the authority of the corporation.   The local board and the

agency combined, did not form or constitute a corporation, but, simply, the local means or agency through which the corporation carried on and transacted its business in this country. When the local board and agency issued a policy, collected a premium, adjusted a loss, or appointed a subordinate agency, it was not done for itself, but for the defendant. And the power exercised in performing either, or all of those acts, was derived from, and used for, the defendant. No matter how formal or complicated such a local organization may be; it can only possess and exercise the power conferred by its foreign charter and the laws of the state upon the corporation itself. And when it makes use of such powers, it does so not as an independent body, or in the nature of a subsisting corporation, but as an agency, merely, of the corporation under which such organization may have been effected. This is entirely apparent, from the facts that, without the charter, and the laws of the state relating to such corporation, the local board could be neither regularly organized or acquire the power of acting at all. And in case these laws were to be repealed, and the charter were withdrawn, or the corporation were to be otherwise dissolved, the local board and agency would, necessarily, from that time cease to exist. It is not intended to be affirmed, that the right of foreign corporations to transact business in this state, is absolutely dependent upon the existence of some statutory regulation in their favor. But only that the transaction of such business is dependent upon a compliance with the provisions of those statutes, while they may be maintained by the legislative authority of the state. But it is maintained that, while these laws are in existence, a compliance with their requirements, whether it be by a mere agency, properly so called, or by a board of local direction, having a general charge and control over the American business of the corporation, without

any immediate dictation or control from the corporation itself, constitutes, in fact as well as in law, a mere agency, and nothing beyond that. And this is insufficient to change the domiciliary nature of the corporation itself, under whose power and authority, whether acquired by its foreign charter, or the laws of the state relating to foreign insurance companies doing business here, this formal as well as efficient organization may have taken place. This organization was merely the medium through which the defendant carried on and transacted its American insurance business — the means through which it was done, not the body itself, which did that business. Accordingly, when insurances were made, as is shown by the policy issued in this instance, it was the defendant that made the insurance, and was to receive the premium for it, and pay the loss arising under it, and not the agency and board of directors existing in the city of New York. It is true the money would pass into the hands of the local agency, and under the control of the local board, when premiums were paid, and from them, in the payment of losses, accepted and adjusted by them, but still it would be all the time received and disbursed as the money of the defendant, in whose behalf, and under whose authority, the local board and agency alone had the power of acting.

As the contract of insurance made in this case was necessarily the contract of the defendant, therefore, when the war, or southern insurrection arose, it was not one which existed between a loyal citizen and a rebel. But of necessity between a neutral and a rebel recognized by the defendant's government as a belligerent. And this recognition, though not binding upon or adopted in a friendly spirit to the government of the United States, was binding and controlling as authority upon the defendant. As a contract between a neutral and a rebel, or, as the defendant's government designated him, a belligerent, it was

neither annulled nor suspended by the proclamation of the president, or the laws of congress. For they were not expressly or by necessary implication made applicable to cases of that character. The plaintiff was not, therefore, prevented from maintaining this action by any thing rendering illegal the insurance which was effected in this case.

But by the terms of the policy, the right of the assured to depend upon it as an insurance, was rendered conditional upon the performance of the stipulations requiring payment of the premiums. By the written appointment of the agent at Richmond, no authority was conferred upon him to receive payment of insurance premiums. That appears to have been derived from what were called renewal receipts, which were forwarded from the agency at New York to the local agent, and by him delivered to the assured as the premiums were paid. Even this practice was discontinued after the early part of the year 1861. This discontinuance, did not arise out of any disposition, manifested by any act of the defendant, or the New York agency, to terminate its policies, or to decline payment of its premiums, but on account of their inability to communicate readily with the local agent at Richmond. When it took place, the means for carrying on such communication had been interrupted and suspended by the insurrection. The facilities before that time supplied by the mails and express companies traversing the country had necessarily been withdrawn, on account of the hostile and dangerous condition of the southern states. And the only remaining means of communication was that which was supplied by individuals occasionally passing around or through the lines of the military forces.

The agency at New York appears to have been of the most complete and general character, but still, as already shown, merely an agency. It therefore had the power to

create and appoint subordinate agencies, wherever in its judgment the business of the defendant required them to be located. And this it could do either by way of writing or by parol. And when the appointment was made by writing, and nothing limiting the action of the local agency was contained in it, the power of the local agent could afterwards, without any legal impropriety be enlarged by parol. In this respect the New York agency was unrestricted by any limitations placed upon its action by the defendant, or the instruments used by itself for the creation of the subordinate local agency. For while the written power of appointment issued to Cowardin in this case, conferred certain authority upon him as agent for the defendant, not as agent for the New York agency at the city of Richmond, it contained nothing preventing additional authority being given to him, either by the New York agency or by the defendant itself. Neither was any thing of that nature contained in the renewal receipts. For, by the printed instructions issued to him by the New York agency, he was only prohibited from receiving premiums without a regular renewal receipt, in the absence of special authority for acting otherwise from the New York office. This agency could, therefore, authorize the subordinate agency to receive the premiums accruing on the defendant's policies without supplying him with renewal receipts for that purpose. And in the condition of the country, after the premium was paid in June, 1861, which rendered the transmission of these renewal receipts impracticable, it was claimed on the part of the plaintiff that such authority was actually conferred.

Evidence was given upon the trial tending to substantiate this claim, and on the part of the defendant to resist it. This evidence was of a conflicting nature, and as it was fairly submitted to the jury, this court, at the present time, has no power to interfere with their conclusion upon that subject. They have found that the authority was

Robinson *v.* International Life Assurance Society of London.

conferred, substantially, of course, as the evidence on the part of the plaintiff tended to establish it. And if it was, it amounted to a general authority to the local agent at Richmond to receive the premiums without renewal receipts, and without specific directions as to what he should receive them in. It was therefore a general authority to him to collect the premiums accruing in the defendant's favor upon the policies which it had previously issued. And this authority, under the well settled principles of the law of agency, the agent became bound to his principal to make use of according to the ordinary course of the business he was employed in, and the settled usages, if any were found to exist, relating to the subject. He could not therefore bind his principal, or satisfy the powers of his agency, by accepting property for the premiums; for that would convert the power to receive payment merely, into an authority to traffic in merchandise. But from the nature of the power to receive payment, the agent necessarily derived the authority to accept whatever was generally used for the purposes of making payments in the locality where the debts were to be collected. As it has turned out, it would have been more profitable for the principal if the agent had collected the premiums upon this insurance in gold coin or treasury notes of the United States. But when this authority to collect the premiums was exercised, it appears from the evidence that it could not be either conveniently or effectively used in that manner. For gold was shown to have disappeared almost entirely from circulation, and it is a matter of history that the insurrectionary authorities discountenanced the use of United States treasury notes.

When this authority was given, which the jury have found was conferred upon the agent at Richmond, there was no immediate indication that any further opportunity would be afforded for communicating with him while hostile relations existed between the government and the

rebel states. And it must, therefore, have been designed for his guide under circumstances at that time not fully anticipated or comprehended. The end to be obtained by the use and exercise of the authority, was to be the payment of the indebtedness accruing to the defendant. And if circumstances should arise requiring the exercise of judgment and discretion, in making the collection, it must have been intended that this agent should determine such matters for himself. On account of the impracticability of communicating either with the defendant or the general agency located here for the procurement of special directions, such emergencies must, from the nature of the times, have been necessarily within the expectation of the general agency, and when they arose afterwards it was the duty of the special agent, to determine upon the best mode of securing the object of his principal, under the circumstances. His duty, as well as his authority, was to collect the debts maturing in favor of the defendant. How that could best be done, was necessarily left to his own prudence and judgment when the changes in the times rendered a determination upon that point indispensable to the exercise of his authority.

That such changes did arise is clearly shown by the evidence. For soon after the agent at Richmond was directed to collect the premiums without renewal receipts, the actual currency of that locality was supplanted by Confederate notes of the insurrectionary government. Although not made a legal tender for the payment of debts, all other species of currency was soon driven out of circulation by them. And after that, they were the financial means used for buying and selling property, and for creating and discharging debts; and while that was their character, and the premium upon gold and foreign exchange was not far above them, they were received by this agent in payment of the premiums due on this insurance. The uncontradicted evidence given in the case is that these

notes were issued soon after the passage of the act providing for them, which was, on the 19th of August, 1861. And from that time they passed, equal to bank notes, and during the residue of 1861, and through 1862, they were known as Confederate money, and passed almost at par at Richmond. The acceptance of this currency as payment of the premiums upon the policy in suit, spurious and unlawful as the currency itself was, very materially differed from the acceptance of payment in property, or in counterfeit notes or the notes of insolvent banks. For the acceptance of property was not within the spirit or scope of the agency, and the bills of insolvent banks and counterfeit notes would be wholly devoid of value, and therefore no payment whatever, in any just sense of that term. But these notes were not of that description. For they had a circulating value, at the time the agent received them, and were used for all the ordinary purposes of currency. While in that condition, he received them as payment, and from the hopeful account given by him of the prospects of the Confederacy, contained in his letter of June, 1861, he undoubtedly did so in good faith, believing he was promoting his principal's interests by doing so. From the nature of the power which the jury have necessarily found was conferred upon him, the circumstances that must have been expected to attend the execution of it, the emergency he afterwards encountered, when the previous currency of his state was practically excluded from circulation by that which was issued by the Confederate authorities, the premiums upon this policy were in judgment of law paid, when the defendant's agent received the amount due for them, in these notes. It was the only feasible mode under the circumstances existing at that time, in which the premiums could be collected by him, and as it had been made his duty to obtain their payment, he was necessarily authorized to receive it in that manner.

But even if that authority were not a necessary incident of the power conferred upon him, still as he was authorized to collect the premiums, his acceptance of Confederate notes for the amount of them discharged the assured. For, under the circumstances existing at the time when the authority to collect was conferred upon him, it could neither have been expected nor intended that the identical currency received by him should be remitted to the general agency at the city of New York. This currency, although valuable at Richmond, was worthless at New York. The only mode, therefore, in which the value it had at Richmond could be transmitted to New York, was by purchasing gold or foreign exchange with it, and it appears from the evidence that it was capable of being so used. In addition to this, the course of business previously established between New York and the Richmond agency was for the agent at the latter place to make up his accounts, and remit his collections once in each month, which was inconsistent with the obligation or expectation that the identical moneys received by him were to be remitted to the agency at New York. On the contrary, the notorious and general course of business, in cases of that description, was to purchasese exchange with the local currency, and in that manner transmit its value to the place to which it was to be forwarded. Not only the state of public affairs, but the customary mode shown to have been adopted in the transaction of this business, also indicate that it could not have been intended that the local currency used and received for the payment of debts at Richmond should be remitted in kind to New York. On the contrary this was received for the convenient transaction of the agent's business at the place where it fulfilled all the purposes and offices of a monetary currency. And accompanying its receipt was the corresponding duty to invest it in such funds or commercial paper, as would enable him to transmit its local value to the gen-

Robinson *v.* International Life Assurance Society of London.

eral agents whose business was carried on at a place where that local value had no existence.

Under this relation and obligation of the local agent, he became the defendant's debtor for the value of the Confederate currency at the time and place when and where it was received by him. And that obligation can only be effectually discharged by transmitting or paying that value in lawful money or its equivalent to the defendant's general agents at the city of New York. By the acceptance of the premiums in Confederate notes the agent discharged the assured, but, at the same time, under his obligations arising out of the peculiar circumstances of the case, and the previous course of business between himself and the defendant's general agency, he became the defendant's debtor for the amount received, with the duty of remitting it in such a manner to the general agency at New York, as to transfer the full local value for the time being received by him to such agency.

The portion of the answer to the sixth cross-interrogatory propounded to the witness Cowardin was properly excluded. It was not evidence tending to prove any fact whatever in the case. But it consisted merely of the supposition of the witness, which in no sense constituted evidence of the existence of the fact it related to.

No ground is presented by the case in this action which will justify a reversal of the judgment recovered by the plaintiff; it should, therefore, be affirmed.

MULLIN, J. I concur in the conclusion at which my brother DANIELS, has arrived, in this case; but I cannot agree with him that Cowardin had authority to receive premiums, after the breaking out of the rebellion, in Confederate notes, so as to bind the defendant.

Cowardin had been in the practice of receiving whatever passed as money in Richmond prior to the rebellion, and remitting to the defendant's agents in New York

such premiums in funds current in that city.    The authority thus to remit continued after the commencement of hostilities, as it had not been revoked.    Cowardin had no authority to remit to the defendant at London.    The agents here were the only persons to be recognized. And when it happened that the currency in circulation in Richmond became of no value in New York, the right of Cowardin to receive it ceased.    He might as well have received forged paper, as Confederate notes.    There was no value in either.    His power to accept such bills in payment never existed for an instant of time, as there never was an instant of time when they were lawful currency, or of any value at New York; at which place, only, could Cowardin make payment.

Judgment affirmed.

[New York General Term, November 2, 1868. *Ingraham*, *Mullin* and *Daniels*, Justices.]